**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SCHNEIDER, | ) | CASE NO. 4:23-cv-02383 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| CORECIVIC OF TENN., LLC, | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |

**I. Procedural History**

Defendant removed this matter from state court on the basis of diversity jurisdiction. (R. 1).

Thereafter, Plaintiff Michael Schneider filed a two-count Amended Complaint raising the

following claims against Defendant CoreCivic of Tennessee, LLC alleging: (1) worker's

compensation retaliation and (2) wrongful discharge in violation of public policy: worker's

compensation claim. (R. 7). Now pending is Defendant's motion for summary judgment on

Plaintiff's claims (R. 20), which Plaintiff has opposed. (R. 21). Defendant also filed a reply in

support. (R. 22).

**II. Summary of Key Facts**

This lawsuit stems from an incident that occurred during Plaintiff's employment at

CoreCivic, resulting in an injury, subsequent resignation or termination, and a pursuit of a

workers' compensation claim.

### A. Background

According to Douglas Fender, Warden of the Northeast Ohio Correctional Center and an employee of Defendant, CoreCivic provides correctional services under contract with the U.S. Marshals Service and the Ohio Department of Rehabilitation and Corrections, and operates the Northeast Ohio Correctional Center (NEOCC) in Youngstown, Ohio. (R. 20-3, PageID #182).

Plaintiff began working for CoreCivic as a correctional officer at NEOCC on or about April 2, 2021. (R. 20-4, PageID #376; Exh. 2). He signed an offer letter that described the position as at-will. *Id.* at PageID# 375 ("This offer does not constitute an actual or implied contract for employment and your employment with CoreCivic can be terminated, with or without cause, at any time at your discretion or at the discretion of either the company.") As a correctional officer, Plaintiff was responsible for maintaining order and supervising inmates. (R. 20-4, PageID #377; Exh. 3). CoreCivic provided Plaintiff with policies governing code of ethics, retaliation, and workers' compensation. (R. 20-4, PageID #383-405; Exhs. 5-11). During his deposition, Plaintiff acknowledged receiving the Workers' Compensation Benefits policy during training, and did not have any questions about its contents. (R. 20-4, PageID #250-51, Schneider Depo. at 68-69). He never filed any complaints or grievances during his employment. (R. 20-4, PageID #250, 276; Schneider Depo. at 68, 94).

Plaintiff received three formal disciplinary notices during his tenure. The first occurred in February 2022, when a supervisor reprimanded him for doing pullups with detainees rather than overseeing security. (R. 20-4, PageID #264-65, Schneider Depo. at 83-83; Exh. 14, PageID# 415-16). A second occurred in July 2022, when another supervisor disciplined him for failing to conduct a timely "watch tour" or security check. (R. 20-4, PageID #269-70, Schneider Depo. at 269-70; Exh. 15, PageID# 417). The third occurred in September 2022, when he received a

notice for refusing to work a mandatory overtime shift to fill a vacancy. (R. 20-4, PageID #271-74, Schneider Depo. at 89-92; Exh. 16, PageID# 418). Despite this history, Plaintiff's job responsibilities and schedule remained unchanged, and he never received a pay deduction. (R. 20-4, PageID #275-77, Schneider Depo. at 93-95). His supervisors never placed him on probation or administrative leave, and he was not aware of any investigations pending against him prior to the incident that preceded his resignation. *Id*.

**B.     Workplace Incident and Medical Treatment**

On May 20, 2023, Plaintiff began his shift at 7:04 p.m., and he worked the Bravo 1-3 unit. (R. 20-4, PageID #283, 292, Schneider Depo. at  101, 110). He described inmates in Bravo 1 as "high custody," which meant they were more dangerous while the other inmates in the remaining areas were "just medium." *Id*. at PageID# 292. While in Bravo 1, inmates began banging on their cell doors and requested Plaintiff to transfer them to Bravo 3, indicating that was where they were housed. (R. 20-4, PageID #297-98, 302, Schneider Depo. at 115-16, 120). Plaintiff opened the door, allowing the inmates to go from Bravo 1 to Bravo 3. (R. 20-4, PageID# 302-303, Schneider Depo. at 120-121). According to Douglas Fender, warden of the facility, he "immediately started listening to the radio to hear what was going on and started reviewing the camera footage to see what was taking place." (R. 20-5, PageID# 496, Fender Depo. at 74). While reviewing the camera footage shortly after the incident, he witnessed Plaintiff allow inmates to go from one pod to another numerous times over a twenty minute span. (R. 20-5, PageID# 496-98, Fender Depo. at 74-76). Fender testified that Plaintiff was not supposed to allow that to happen, and that he had "no excuse for letting them back and forth." *Id*. at PageID# 498.

Shortly after Plaintiff allowed the inmates to move from one pod to another, a physical

3

altercation broke out between four inmates, who began stabbing one another. (R. 20-4, PageID# 303-04, Schneider Depo. at 121-22). Plaintiff was the only officer in the area; he screamed for help via radio and activated his emergency "man down button." (R. 20-4, PageID# 305-06, Schneider Depo. at 123-24). Plaintiff attempted to intervene, and an inmate stabbed his wrist during the struggle. (R. 20-4, PageID# 306, 314, Schneider Depo. at 124, 132). Plaintiff was not carrying his assigned defensive spray or handcuffs at the time; he states the control officer would not give him the equipment because he did not have any "chits," which he described as "pictures of himself" used to checkout equipment.  (R. 20-4, PageID #307-08, Schneider Depo. at 125-26).

Once assistance arrived and the inmates were secured, Plaintiff proceeded to the medical unit. (R. 20-4, PageID# 314, Schneider Depo. at 132). The nurse cleaned and bandaged his wrist, and advised him to seek follow-up care due to concerns about bloodborne pathogens. (R. 20-4, PageID #314-15, Schneider Depo. at 132-33). Plaintiff's main concern was that he was exposed to HIV. *Id*. Before he left, the nurse provided Plaintiff with workers' compensation paperwork. (R. 20-4, PageID #315-16, Schneider Depo. at 133-34). Plaintiff did not fill it out that night and instead took the blank forms home. *Id*.

According to Plaintiff, photographs were taken of the injury to his wrist on the date of the injury at 8:36 p.m. (R. 20-4, PageID# 289-90, Schneider Depo. at 107-08). The photographs were taken in the captain's office by Sergeant McCoy. *Id*. at PageID# 102, 290. Plaintiff testified that nobody asked him any questions about the incident at that time, nor did he ask any questions. *Id*. at PageID# 290-91. Nobody brought up the possibility of discipline. *Id*. at PageID# 291. Warden Fender asked him to write an incident report. *Id*.  Plaintiff testified that he completed an incident report and gave it to Lieutenant Birch. *Id*. at PageID# 291.

4

Plaintiff left the facility at 2:23 a.m. on May 21, 2023; he went home[1] and showered, and then went to an urgent care to get bloodwork done. (R. 20-4, PageID# 316-17, Schneider Depo. at 135-36). According to the urgent care treatment notes, Plaintiff had a "superficial laceration with broken skin" of the right forearm with "no active bleeding or signs of infection." (R. 21-1, PageID# 824, Exh. A). Plaintiff received a tetanus shot and a prescription for HIV-prevention medication. (R. 20-4, PageID #318-19, Schneider Depo. at 136-37). He did not bring the workers' compensation paperwork to the urgent care facility. (R. 20-4, PageID #319, Schneider Depo. at 136-37). According to Plaintiff, he did not incur out-of-pocket costs, did not receive ongoing treatment (neither physical nor psychological), and did not experience lasting physical limitations that prevented him from looking for work. (R. 20-4, PageID #334-35, Schneider Depo. at 153-53).

Warden Fender testified that by May 21, 2023, prior to Plaintiff's employment ending with Defendant, he was aware that Plaintiff had sought medical treatment and that he had a potential workers' compensation claim.  (R. 20-5, PageID# 505-06, Fender Depo. at 83-84).

**C.    Disputed Meeting and Resignation**

The day after the incident, on May 21, 2023, at 11:51 a.m., Warden Fender emailed his supervisor to request that Plaintiff be temporarily reassigned and an investigation occur into the incident on May 20. (R. 20-5, PageID# 538, Fender Depo. at 116; R. 20-5, Exh. 3, PageID# 618). That same day, at Fender's request, Assistant Warden Richard Pfifer contacted Plaintiff

---

[1] Plaintiff indicated to the Warden that it would be difficult to turn the keys with his injured wrist, and Warden Fender told him to go home. (R. 20-4, PageID #288, Schneider Depo. at 106). He clocked out at 2:23 a.m. on May 21. (R. 20-4, PageID #280-81, 283, Schneider Depo. at 98-99, 101). No one discussed discipline with him that night. (R. 20-4, PageID #291, Schneider Depo. at 109).

and asked him to return to the facility to complete an incident report. (R. 20-6, PageID# 686-87, 692, 743, Pfifer Depo. at 34-35, 40, 91).

According to Plaintiff, he returned to the facility on May 22, 2023, because Assistant Warden Pfifer told him to come in and talk about his injuries. (R. 20-4, PageID# 320-23, Schneider Depo. at 138-41). Upon his arrival, Pfifer told him, "[W]e want you to resign or you can get fired and it will be hard for you to get a job ever again in corrections." (R. 20-4, PageID #321-22, Schneider Depo. at 139-40). Plaintiff testified that he asked to make a phone call, to which Pfifer replied in the negative. *Id*. at PageID# 322.[2] Plaintiff also stated that Pfifer directed him to write a statement explaining why he lacked handcuffs and pepper spray during the altercation. (R. 20-4, PageID #327-28, Schneider Depo. at 145-46). Plaintiff finished typing out his statement, which was printed out, but he was not asked to sign it. (R. 20-4, PageID# 328, Schneider Depo. at 146). He was at the facility for about two hours total that day. *Id*. at PageID# 324.

Plaintiff told Pfifer he was resigning after Pfifer had returned from making a phone call. (R. 20-4, PageID# 330, Schneider Depo at 148). Approximately ten minutes later, he was escorted out of the building by Unit Manager Michelle Haas. (R. 20-4, PageID #329-30, Schneider Depo. at 147-48). He did not bring the workers' compensation paperwork with him to the meeting with Pfifer and never submitted a claim during his employment. (R. 20-4, PageID# 331-33, Schneider Depo. at 149-51).

Pfifer recalled the events differently. He testified that he told Plaintiff that CoreCivic

---

[2] Plaintiff's deposition testimony here is unclear, as it appears he's stating that he was on the phone with Pfifer yet talking to him in person at the same time. (R. 20-4, PageID# 322, Schneider Depo. at 140).

needed a written statement about the incident, and while that was transpiring, he had to leave his office and Unit Manager Haas remained with him. (R. 20-6, PageID# 693-94, Pfifer Depo. at 41-42). Upon his return, Pfifer indicates Plaintiff asked him, unsolicited, whether he should resign, to which Pfifer responded, "that's up to you." (R. 20-6, PageID #694, Pfifer Depo. at 42). According to Pfifer, he only asked Plaintiff to provide a statement, which he never received, and left the room several times to handle unrelated work issues. (R. 20-6, PageID #694-697, Pfifer Depo. at 42-45). Pfifer stated that while he was away, Haas remained with Plaintiff (R. 20-6, PageID #704, Pfifer Depo. at 52). Pfifer indicated he never recommended that Plaintiff be terminated. *Id*.

A termination checklist listed Plaintiff as having voluntarily resigned, but not eligible for rehire due to negligence in the workplace. (R. 20-5, PageID# 620, Exh. 5). Fender testified that he could not recall whether he or Pfifer directed HR to classify the separation as a voluntary resignation. (R. 20-5, PageID #550-51, Fender Depo. at 128-29). He did indicate that while an investigation had not been completed, resignation while an employee was under investigation is a factor considered in determining whether an individual is eligible for rehire. *Id*. PageID# 553-54. On May 22, 2023, Pfifer sent an email indicating that Plaintiff "reported to the facility to complete a 5-1C in regards to an incident that occurred on Saturday 5/20/23. While filling out the 5-1C Michael Schneider stated to A.W. Pfifer that he was resigning his position. Please be advised he stated this to Unit Manager Haas that he was resigning as well about 20 minutes later." (R. 20-5, PageID# 621, Exh. 6). Plaintiff never contacted the facility to ask about his job status and never received a termination letter. (R. 20-4, PageID #331-32, Schneider Depo. at 148-49).

Defendant concedes that the Court must accept as true Plaintiff's testimony that Pfifer told

7

him he should resign or get fired, which would make it difficult for Plaintiff to work in corrections in the future, but notes it will dispute this allegation at trial. (R. 20-1, PageID# 169, n. 6).

### III. Summary Judgment Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. Law and Analysis

**A.      Count One: Workers' Compensation Retaliation**

In Count One of the Amended Complaint, Plaintiff raises a claim for workers' compensation retaliation. (R. 7, PageID# 75-76). Defendant moved for summary judgment on Count One, arguing that Plaintiff's claim fails for three reasons: (1) Plaintiff never filed a workers' compensation claim during his employment at CoreCivic; (2) Plaintiff voluntarily resigned from CoreCivic; and (3) Plaintiff did not raise a retaliation claim until *after* the statute of limitations expired. (R. 20-1, PageID# 171).

Plaintiff's brief in opposition failed to offer any response or defense regarding the workers' compensation retaliation claim he raised in Count One, focusing solely on his public policy claim in Count Two. (R. 21, PageID# 816-822). Notably, Plaintiff does not address Defendant's statute of limitations argument, which is dispositive as to the viability of the retaliation claim. As stated recently by the Sixth Circuit Court of Appeals, "[w]hen a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) (citations omitted). "To address an argument in the district court, a litigant must provide some minimal argumentation in favor of it." *Id*. (citing *United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009); s*ee also Solidstrip Inc. v. U.S. Tech. Corp.,* 723 F. Supp. 3d 593, 601 (N.D. Ohio 2024) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (quoting *Brown v. VHS of Mich., Inc.,* 545 Fed. App'x 368, 372 (6th Cir. 2013) (collecting cases)). Accordingly, Plaintiff's workers' compensation retaliation claim in Count One is dismissed as abandoned.

Alternatively, even if the Court does not construe the retaliation claim in Count One as abandoned or forfeited, the Court finds merit in Defendant's argument that the claim is untimely. Plaintiff's employment with Defendant ended on or about May 21, 2023, regardless of whether he resigned or was constructively terminated. (R. 20-5, PageID# 620; Exh. 5). Plaintiff's initial state court complaint, which was removed to this Court, only contains a claim for wrongful discharge in violation of public policy. (R. 1-1, PageID# 14-20). Plaintiff first asserted his workers' compensation *retaliation* claim pursuant to O.R.C. § 4123.90 in the Amended Complaint filed on February 12, 2024, which is 267 days after his separation from his employment with Defendant. (R. 7, PageID# 75-76). Pursuant to the explicit language of O.R.C.

§ 4123.90, an action under said statute "shall be forever barred unless filed within one hundred eighty days immediately following the discharge, demotion, reassignment, or punitive action taken" and that "no action may be instituted or maintained unless the employer has received written notice of a claimed violation of this paragraph within the ninety days immediately following" the adverse employment action.

Plaintiff herein plainly exceeded the 180-day statute of limitations. Accordingly, the claim is time-barred. Therefore, Count One is alternatively dismissed as time barred.

**B.      Count Two: Wrongful Termination in Violation of Public Policy**

In Count Two, Plaintiff asserts a cause of action for a wrongful discharge in violation of public policy.  (R. 7, PageID# 76-77). To prevail on a claim for wrongful termination in violation of public policy, a plaintiff must establish the following elements:

1) That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3) The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4) The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Collins v. Rizkana,* 652 N.E.2d 653, 73 Ohio St.3d 65, 69 (Ohio 1995) (quoting *Painter v. Graley*, 639 N.E.2d 51, 70 Ohio St.3d 377, 384 (Ohio 1994). This Court will refer to this as the "*Collins* test."

The Amended Complaint invoked the Ohio Supreme Court's decision in *Sutton v. Tomco Machine*, 950 N.E.2d 938, 129 Ohio St. 3d 153, 163 (Ohio 2011), which states that "we

recognize a common-law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after an injury but before he or she files, institutes, or pursues a workers' compensation claim." (R. 7, PageID# 76-77, ¶80).

> In Ohio, the common-law doctrine of employment at will governs employment relationships. The act of terminating an at-will employee's relationship with an employer usually does not give rise to an action for damages. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 67, 652 N.E.2d 653; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus. However, if an employee is discharged or disciplined in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule. *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus; *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph one of the syllabus.

*Dohme v. Eurand Am., Inc.*, 130 Ohio St. 3d 168, 171, 956 N.E.2d 825, 828–29 (Ohio 2011).

This Court need not address the first two elements of the *Collins* test, as the Ohio Supreme Court has already decided a clear public policy exists against terminating employees for filing workers' compensation claims, and that terminating an employee before he institutes a workers' compensation claim would jeopardize the public policy. Thus, the only remaining issue is whether Plaintiff's alleged dismissal was motivated by conduct related to the public policy—that is, was it motivated by the anticipated workers' compensation claim (the causation element). Defendant's brief in support of summary judgment asserts that it is entitled to judgment in its favor because: (1) Plaintiff voluntarily resigned; and (2) Plaintiff ostensibly cannot establish causation between his workplace injury and separation of employment. (R. 20-1, PageID# 177-179).[3]

---

[3] Defendant has not argued that it had an overriding legitimate business justification for Plaintiff's dismissal, and that element of the *Collins* test is moot.

Plaintiff presents a public policy tort claim in Count Two based on the theory that his separation from employment constituted a constructive discharge, and that the discharge was retaliatory in light of his anticipated workers' compensation claim. (R. 7, PageID# 76-77, ¶¶78-85). The Court addresses the claim in two parts: first, whether Plaintiff has presented sufficient evidence that would allow a reasonable trier of fact to find: (1) that his employment was terminated under a constructive discharge theory; and (2) sufficient evidence of a nexus between the alleged constructive discharge and the potential workers' compensation claim.

### 1.  Constructive Discharge

Plaintiff argues he was constructively discharged after giving notice of his pursuit of worker's compensation claims. (R. 21, PageID# 818, 821).  "Courts generally apply an objective test in determining when an employee was constructively discharged, *viz*., whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Mauzy v. Kelly Servs*., 75 Ohio St. 3d 578, 588-89, 664 N.E.2d 1272, 1280-81 (Ohio 1996). "A claim of constructive discharge is in essence a claim that the employer's conduct was so egregious that the employee was 'forced . . . to sever the employment relationship involuntarily.'" *Helms v. Fischer Mgmt*., 2005 U.S. Dist. LEXIS 27259, at *19 (S.D. Ohio Nov. 10, 2005) (*quoting Risch v. Friendly's Ice Cream Corp.*, 136 Ohio App.3d 109, 112, 736 N.E.2d 30, 32 (1999)).

Defendant, relying on cases that cite the Sixth  Circuit Court of Appeals' decision in *Logan v. Denny's, Inc.*, 259 F.3d 558, 570 (6th Cir. 2001), argues that the Sixth Circuit has adopted seven factors to aid in the determination of whether the employer created working conditions that a reasonable person would find intolerable: "(1) demotion; (2) salary reduction; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5)

reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign; or (7) offers of early retirement or continued employment on less favorable terms." (R. 22, PageID# 847, *citing Phillips v. Am. Red Cross Blood Servs.*, Case No. 3:20-cv-01714, 2023 U.S. Dist. LEXIS 172378, *18, 2023 WL 6290648

(N.D. Ohio Sept. 27, 2023) (citing *Logan* 259 F.3d at 69 (6th Cir. 2001) (adopting the Fifth Circuit's approach in *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000)).

Defendant argues that "[f]rom the record, it is undisputed that Plaintiff has presented no evidence of a demotion, salary reduction, job responsibility reduction, reassignment [of] work, reassignment of supervisor, badgering, harassment, or humiliation, or an offer of early retirement or continued employment on less favorable terms." (R. 22, PageID# 847, citing Schneider Depo. Tr. 65, 93-94). Defendant is correct that the record does not contain any evidence that falls into any of these categories, but Defendant overlooks the *Logan* court's cautionary language that the seven factors are a "non-exclusive list of factors." 259 F.3d at 570.

There is, however, evidence, that the Court must construe in Plaintiff's favor, as the non-moving party, that the Assistant Warden stated: "we want you to resign or you can get fired and it will be hard for you to get a job ever again in corrections." (R. 20-4, PageID #321-22, Schneider Depo. at 139-40).[4] Defendant asserts that even such a termination ultimatum is insufficient, and relies on *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 815 (6th Cir. 2020) for the proposition that a plaintiff cannot establish constructive discharge stemming from a

---

[4] In addition, a jury, as the finder of fact, may find Plaintiff's testimony less than credible, and may credit the conflicting testimony by Pfeifer that it was Plaintiff who asked if he should resign, but this Court, at the summary judgment stage, cannot make credibility determinations.

plaintiff's allegation that he was threatened with termination because such a threat is not "objectively intolerable." (R. 22, PageID# 848). Defendant misapplies the holding of *Tchankpa*, as that case is distinguishable on the facts.[5] Here, Plaintiff was not threatened with termination if he failed to comply with certain work-related requirements, as was the plaintiff in *Tchankpa*, rather, if Plaintiff is to be believed, he was threatened with termination if he did not resign.

The facts presented to this Court fall more closely with cases identified by the Fifth Circuit Court of Appeals as constituting a constructive discharge.

> [A] plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired. *See 339 Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997); *Jenkins v. State of La., Through Dep't of Corrs.*, 874 F.2d 992, 996 (5th Cir. 1989); *Davis v. City of Grapevine*, 188 S.W.3d 748, 766 (Tex. App. 2006). However, in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable. For example, in *Davis*, the plaintiff presented evidence that his managers informed him that "it would be in his best interest if he decided to resign rather than be terminated because future employers may ask the City whether Davis resigned or was terminated." *Davis*, 188 S.W.3d at 766. Likewise, in *Faruki*, the plaintiff presented testimony that his supervisor had told him he should find another job, and that he had one week before he would be placed on indefinite unpaid leave. *Faruki*, 123 F.3d at 319; *see also Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1027–28 (5th Cir. 1992) (holding that employee "reasonably could have believed that his demotion was a harbinger of dismissal" where there was a demotion, continuing limitations on the employee's salary and responsibility, and a supervisor repeatedly asked him whether he was going to quit his job).

---

[5] The *Tchankpa* court explained that defendant allegedly told the plaintiff that "it might fire him if he violated its time off policy by seeking treatments during work hours. And when Tchankpa insisted on working from home three days per week, [defendant] reminded him that he could quit if he didn't like his job's requirements. So he argues that these facts show [defendant] pressured him to leave. But [defendant] only insisted that Tchankpa accept its denial of his work-from-home request…. So even forcefully reiterating this lawful denial is not a threatened termination." 951 F.3d at  815.

14

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014). The Sixth Circuit

Court of Appeals made similar observations concerning constructive discharge the same year:

> We are ordinarily faced with a situation in which the employee only alleges that she resigned because of discriminatory harassment, and in such cases, we require the plaintiff to demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment.
>
> But that is not the only method of demonstrating constructive discharge. When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (*quoting E.E.O.C. v. University*

*of Chicago Hospitals*, 276 F.3d 326, 331-32 (7th Cir. 2002). As the Court of Appeals noted, "[i]n

other words, constructive discharge also occurs where, based on an employer's actions, 'the

handwriting was on the wall and the axe was about to fall.'" *Laster*, 746 F.3d at 728 (*citing Univ.*

*of Chicago Hosp.,* 276 F.3d 326, 332 (7th Cir. 2002) (internal quotations and citation omitted).

The Court agrees with the Defendant that Plaintiff has not shown he was constructively

discharged through evidence of any of the intolerable-work-condition factors identified by the

*Logan* court. Moreover, construing the evidence in light most favorable to Plaintiff and,

therefore, proceeding as though he was told he could resign or be terminated, the Court does not

find such termination ultimatum objectively unreasonable and intolerable, but concludes that

Plaintiff had a reasonable choice considering the apparent performance deficiencies and

aforementioned factual background. Thus, the Court does not find that Plaintiff's working

conditions became so intolerable that a reasonable person would have felt forced into an

involuntary resignation. *Id*.

While that could end the analysis, the Court proceeds to the next step *arguendo* as if

Plaintiff's deposition testimony and the aforementioned facts creates a material issue of whether

he was constructively discharged. But as explained next, his case still fails because Plaintiff presents no evidence connecting such discharge with a potential worker's compensation claim.

### 2.   Nexus Between Discharge and Potential Workers' Compensation

Even if Plaintiff has presented sufficient evidence that he was discharged, he must still show that his discharge was connected to a potential workers' compensation claim in order to demonstrate a material issue of fact to overcome Defendant's motion for summary judgment. In *Sutton v. Tomco Machining, Inc.,* the Ohio Supreme Court, while recognizing a public policy tort wrongful discharge *prior* to the filing of a workers' compensation claim, indicated that "[t]o establish causation [for such a claim], a plaintiff who alleges wrongful discharge in violation of public policy as expressed in R.C. 4123.90 **must prove that the adverse employment action was retaliatory, which requires proof of a nexus between the adverse employment action and the potential workers' compensation claim**." 950 N.E.2d at 949 (emphasis added).

To the extent Plaintiff's brief suggests that it is inappropriate to address the causation element at the summary judgment stage (R. 21, PageID# 821), the Court disagrees. While the *Sutton* Court expressly declined to evaluate causation *at the pleading stage*, it affirmed that a plaintiff must show by a preponderance of the evidence that there is a causal connection between the discharge and the workers' compensation claim. *Sutton*, 129 Ohio St.3d at 157 ("[T]he retaliatory nature of the discharge and its nexus with workers' compensation must be established by a preponderance of the evidence.") Courts have frequently addressed whether genuine issues of material fact were present to satisfy the causation element without noting any impropriety by a court for doing so. *See, e.g., Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003) (overturning grant of summary judgment in defendant's favor because the plaintiff "established a genuine issue of material fact as … causation" but voicing no disapproval of district court's

16

decision to engage the issue); *accord Whitaker v. First Energy Nuclear Operating Co.*, 2013 WL 4792860, 2013-Ohio-3856, ¶17 (Ohio Ct. App. Sept. 6, 2013) ("To avoid summary judgment [on a public policy tort claim], however, the employee must establish a genuine issue of material fact as to *each of the four elements*.") (emphasis added); *Jones v. Natural Essentials, Inc.*, 2022-Ohio-1010, ¶ 60, 187 N.E.3d 594, 606 (Ohio Ct. App. Mar. 28, 2022) ("In the present case, the plaintiffs have failed to establish the existence of a genuine issue of material fact with respect to causation" as it relates to their public policy workers' compensation retaliatory discharge claim.)

This case is well beyond the pleading stage and the parties have conducted significant discovery. Thus, Plaintiff must point to evidence that establishes a genuine issue of material fact with respect to causation. Without evidence capable of establishing a nexus between the protected activity and the adverse action, summary judgment is appropriate. "[T]he law requires the plaintiff to show purposeful retaliation; that is, a specific intent to discharge an employee for engaging in the protected act of filing a workers' compensation claim. If, at the time of employment termination, the person making the decision to terminate is unaware that the employee may be filing a workers' compensation claim, the discharge cannot be retaliatory in nature." *Glenn v. Hose Master, L.L.C.*, 2016-Ohio-1124, ¶ 32, 61 N.E.3d 609, 617 (Ohio Ct. App. Mar. 17, 2016). The burden of establishing retaliatory motive in a workers' compensation claim "remains at all times on the employee." *Bertrand v. Collinwood Servs. Ctr.*, No. 58508, 1991 WL 81487, 1991 Ohio App. LEXIS 2278 at *8 (Ohio Ct. App. May 16, 1991); *accord Nance v. Lima Auto Mall, Inc.*, 2019 Ohio Misc. LEXIS 7627 at *5 (Ohio Ct. Com. Pl. Aug. 14, 2019). Furthermore, the *Sutton* decision specifically indicated that "no presumption of retaliation arises from the fact that an employee is discharged soon after an injury." 129 Ohio St.3d at 157.

Having reviewed those portions of the record cited by the parties, Plaintiff fails to

17

identify any statements, documents, or conduct by Defendant indicating a retaliatory motive connected to a possible workers' compensation claim. On the same day that Plaintiff suffered a workplace injury, a nurse working at the facility provided Plaintiff with worker's compensation forms—an action that does not suggest any effort to interfere with the exercise of protected rights. (R. 20-4, PageID# 316, Schneider Depo. at 133-134).

Plaintiff's injury was not severe on its face, with the most significant concern being whether he had contracted any bloodborne pathogens from a minor cut. (R. 20-4, PageID #314-15, Schneider Depo. at 132-33). According to the urgent care treatment notes, Plaintiff had a "superficial laceration with broken skin" of the right forearm with "no active bleeding or signs of infection." (R. 21-1, PageID# 824, Exh. A). Although Defendant's employees may not have been aware of this treatment note, pictures were taken the day the incident by Defendant's employees so that Defendant would have been aware of the minor severity of the injury.  (R. 20-4, PageID# 289-90, Schneider Depo. at 107-08). While the Court does not find the severity of Plaintiff's injury dispositive in any way, a severe or debilitating injury may be more likely to raise an inference that an employer was attempting to evade responsibility for a costly injury by preemptively terminating an employee.

Plaintiff also did not bring his workers' compensation paperwork to the meeting with Pfifer the day he resigned, voluntarily or otherwise. (R. 20-4, PageID# 331, Schneider Depo. at 149). Plaintiff's assertion that he called on May 21, 2023, so that "he could get assistance with his worker's compensation paperwork" is unsupported by the record, and Plaintiff's citation to the Complaint is insufficient at this stage of the pleadings to establish any fact. (R. 21, PageID# 811, citing Compl. at ¶¶47-48, n. 36). Thus, Plaintiff has no evidence that Defendant was even aware that Plaintiff intended to actively seek to file a workers' compensation claim. While

18

Warden Fender was aware that Plaintiff had sought medical treatment and that he had a potential workers' compensation claim (R. 20-5, PageID# 505-06, Fender Depo. at 83-84), the Court finds this alone, even coupled with the proximity of Plaintiff's termination, insufficient to create an issue for the trier-of-fact.

As stated above, Plaintiff's claim arises under Ohio law and no presumption of retaliation arises from the fact that an employee is discharged soon after an injury. Although both Fender and Pfifer knew about the injury and the workers' compensation paperwork, knowledge alone does not establish causation. *See Rowe v. Hoist & Crane Serv. Grp.,* 2022 Ohio App. LEXIS 2972, 2022 WL 4099938, 2022-Ohio-3130, ¶¶ 46-50 (Ohio Ct. App. Sept. 8, 2022) (affirming summary judgment for employer—noting the allegation that an employer terminated an employee to prevent a workers' compensation is merely speculative). Plaintiff's speculation about why Defendant asked him to resign does not suffice as evidence. *Id.*

Assuming *arguendo* that Plaintiff was indeed constructively discharged, there is ample evidence in the record of a nexus between his discharge and the perceived shortcomings in Plaintiff's performance of his job. As noted above, Plaintiff had received three formal disciplinary notices during his tenure *before* the May 20, 2023 incident. It is undisputed that Plaintiff opened the door that allowed inmates to go from Bravo 1 to Bravo 3—an action that resulted in the inmate melee and an action that Warden Fender described as inexcusable after viewing video footage before Plaintiff's resignation. (R. 20-4, PageID# 302-303, Schneider Depo. at 120-121; R. 20-5, PageID# 496-98, Fender Depo. at 74-76). Discovery has also yielded an email from the day after the incident, but before Plaintiff's resignation, where Warden Fender emailed his supervisor to request that Plaintiff be temporarily reassigned and an investigation occur into the May 20 incident. (R. 20-5, PageID# 538, Fender Depo. at 116; R. 20-5, Exh. 3,

PageID# 618). Warden Fender thereafter requested Assistant Warden Pfifer to contact Plaintiff so he could complete an incident report. (R. 20-6, PageID# 686-87, 692, 743, Pfifer Depo. at 34-35, 40, 91). This Court declines to draw any conclusion or inference that Plaintiff's employment actions amounted to misconduct. Rather, the Court merely observes that Plaintiff has cited no evidence in the record suggesting that it was his workplace injury that animated Defendant or its agents versus these same individuals' assessments, premature or otherwise, of Plaintiff's role in the May 20 incident.

Plaintiff's own testimony underscores the lack of a nexus between his injury and the alleged discharge. He testified that when he arrived for the meeting with Assistant Warden Pfifer, "he didn't even ask me about my wound at all or my injuries" suggesting that the injury and any potential claim did not drive the employer's decision. (R. 20-4, PageID #321, Schneider Depo. at 139). Pfifer instead focused on an unrelated incident and directed Plaintiff to write a statement explaining why he failed to carry required equipment. (R. 20-4, PageID #327).

The record does not reflect any animus or pressure linked to the injury and ensuing workers' compensation claim. It further lacks any circumstantial evidence beyond the mere temporal proximity of events that suggests a retaliatory motive for an anticipated worker's compensation claim. There is also no evidence in the record that Defendant attempted to discourage or dissuade Plaintiff from exercising his right to pursue a workers' compensation claim, but rather the evidence indicates it provided him the necessary forms immediately after the injury.

Plaintiff's reliance on temporal proximity and subjective belief does not satisfy the evidentiary burden at the summary judgment stage. Absent evidence from which a jury could reasonably infer that the anticipated workers' compensation claim motivated the adverse

20

employment action, Plaintiff has not established a genuine issue of material fact on the element of causation. Summary judgment is therefore appropriate on Count Two.

### V. Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment (R. 20) is hereby GRANTED. This action is hereby DISMISSED with prejudice.

IT IS SO ORDERED.

*David A. Ruiz*

David A. Ruiz
United States District  Judge

Date: March 26, 2026

21